# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Tarlochan S. Turna, M.D.,                           File No. 18-cv-00547 (ECT/HB)

        Plaintiff,

v.

        **OPINION AND ORDER**

Mayo Clinic,

        Defendant.

---

Emily Lacy Marshall, Tim Louris, M. William O'Brien, Miller O'Brien Jensen, P.A., Minneapolis, MN for plaintiff Tarlochan S. Turna.

Andrew J. Holly, Caitlin L. D. Hull, Dorsey & Whitney, LLP, Minneapolis, MN for defendant Mayo Clinic.

---

In this ERISA lawsuit, plaintiff Dr. Tarlochan S. Turna seeks to recover long-term disability benefits under an employee welfare benefit plan (the "Plan") sponsored and administered by defendant Mayo Clinic. This case is not about whether Dr. Turna is disabled. The Parties agree Dr. Turna is totally disabled, and the Plan has paid him a monthly long-term disability benefit since September 2016. This case is about the amount of benefits Dr. Turna should receive. Under the Plan, benefits are determined by reference to a claimant's "annual salary" at the time his disability begins. Dr. Turna says the Plan has underpaid him benefits based on an arbitrarily low determination of his pre-disability annual salary. Mayo says that its determination of Dr. Turna's annual salary and the resulting amount of his benefits under the plan are reasonable. The Parties have filed

competing summary-judgment motions.  Should its summary-judgment motion be denied, Mayo alternatively seeks remand of Dr. Turna's claim.  The Parties' summary-judgment motions will be denied, and the claim will be remanded to the administrator for further consideration consistent with this opinion and order.

I[1]

A

Dr. Turna worked as a "full-time physician" at the Mayo Clinic Health System in Cannon Falls, Minnesota.  Compl. ¶¶ 8, 15 [ECF No. 1].  Dr. Turna provided services in the hospital and in the emergency room.  *Id.* ¶ 17; AR 156.  He began working at the Cannon Falls Hospital in 2002, though it appears the hospital was not part of the Mayo Clinic Health System at that time.  AR 597 (physician employment agreement dated March 11, 2002, identifying the employer as "Cannon Falls Hospital District, a Minnesota municipal corporation").  Dr. Turna says his Mayo employment began in 2006.  AR 201. The administrative record and summary-judgment submissions establish—and the Parties

---

[1]     The facts in this section are taken from the Complaint, Answer, and documents in the administrative record of Dr. Turna's benefit claim and, unless noted otherwise, are undisputed.  The Parties did not jointly file the entire administrative record.  Instead, Dr. Turna and Mayo each separately filed a subset of documents from the record that each considers relevant to the pending motions.  *See* Marshall Decl. ¶ 2, Ex. 1 [ECF No. 28] (filed by Dr. Turna); Danielson Decl. ¶ 3, Ex. B [ECF No. 19] (filed by Mayo).  Many documents were filed by both Parties; some documents were filed by only one Party or the other.     Regardless,  the  Parties'  administrative-record  submissions  share  identical pagination (appearing in the lower right corner of each document beginning with the prefix "MAYO").  Therefore, and in the interests of convenience and efficiency, citations to documents from the administrative record will appear in this Opinion and Order with the prefix "AR" and reference to the page number, simply as "AR __," regardless of filer.

agree—that Dr. Turna worked long hours before becoming disabled. *See, e.g.*, Compl. ¶ 24; Answer ¶ 24 [ECF No. 5].

On the advice of his treating physicians, Dr. Turna reduced his work schedule significantly in March 2016 because of adverse health effects from Parkinson's Disease. Compl. ¶ 33; Answer ¶ 33. As a result, Dr. Turna qualified for and began receiving short-term disability benefits effective March 14, 2016. Compl. ¶ 34; Answer ¶ 34. In a letter to Dr. Turna dated July 21, 2016, Mayo Senior Claims Adjuster Nancy M. Ehlke described his short-term disability benefits simply as a continuation of his "full salary" and advised Dr. Turna that, if he remained disabled through a twenty-six-week qualifying (or "elimination") period, then he would qualify for long-term disability benefits under the Plan effective September 12, 2016. AR 208. Along with her letter, Ehlke enclosed a form application for long-term disability benefits and asked Dr. Turna to "please complete this form and return it in the enclosed envelope." *Id.*

Like its short-term disability benefit plan, the Mayo long-term disability benefit plan ties the amount of benefits to a claimant's "annual salary." Compl. ¶ 12, Ex. A at 12; *see also* Answer ¶ 12 (admitting that copy of Plan attached to Complaint as Exhibit A was "in effect when Plaintiff's disability commenced in March of 2016"). The key term of the Plan that describes how Dr. Turna's long-term disability benefit amount would be determined reads in relevant part as follows:

> **Amount of Benefit.** For the purpose of determining the amount of long term disability income benefits . . . the Plan uses your **annual salary**. ***Annual salary*** *means your basic salary at the time your disability begins and the Elimination Period commences (based on your regularly scheduled hours)*

> *and does not include bonuses, incentive pay, commissions,*
> *overtime pay, shift pay or other extra compensation.* The
> **Monthly Benefit** you are eligible to receive is based on **84%**
> of your annual salary at the time your disability commences.

Compl. Ex. A at 12 (emphasis added).

B

Dr. Turna completed the application for long-term disability benefits and signed it August 9, 2016. AR 207. Along with the application, Dr. Turna submitted a letter to Mayo raising what he described as a "significant discrepancy" between his compensation and the amount of short-term disability benefits he was receiving. AR 201. Dr. Turna's letter presages the central issue in this case. Dr. Turna wrote that he believed his short-term disability benefits were "deficient" because the administrator had "seriously undervalued [his] actual pay history." AR 202. Dr. Turna explained that he was raising the issue "in the hope of avoiding the confusion over [his] proper rate of pay that plagued [his] short term disability." AR 201.

Dr. Turna made several points in his letter to substantiate his position that his short-term disability benefits had been underpaid. He wrote that he "was scheduled a minimum of 2,080 hours per year for the last three years . . . covering both the Emergency Department and the Hospital at the same time." AR 201. He represented that his annual compensation "has been substantially above $400,000 for the last four years" and that this figure "never explicitly contained any Bonus Pay, Commissions, or Overtime Pay," items excluded from the computation of annual salary under the Plan. AR 201–02; Compl. Ex. A at 12. Dr. Turna asserted that a July 1, 2015 change in pay model was intended to

facilitate the creation of "safe practices" and was not "intended to be a pay cut." AR 202. In fact, Dr. Turna wrote, the change led to an increase in his hours "as [he] was asked to cover additional shifts generated by the change." *Id.* Dr. Turna asserted that a letter he had received on April 12, 2016—the month after his short-term disability benefits commenced—setting his "total compensation" at $301,566 "was a mistake" because it "did not take [his] regularly scheduled Emergency Department hours into consideration." *Id.* He believed that the short-term disability plan administrator had "undervalued [his] actual pay history" by relying on this document. *Id.* Dr. Turna wrote that his "regular baseline Annual Salary should be in the neighborhood of $398K or higher." [2] *Id.*

After receiving Dr. Turna's application for long-term disability benefits and his accompanying letter, Ehlke looked into the issues Dr. Turna raised concerning the calculation of his benefits. AR 59. Ehlke spoke with then-Chief Administrative Officer Steve Gudgell. [3] *Id.* Gudgell had co-signed the April 12, 2016 compensation letter referenced by Dr. Turna in his August 9 letter. *See* AR 202. Gudgell also co-signed an earlier document dated July 1, 2015, informing Dr. Turna that his compensation from July 1, 2015 through April 2016 would be $298,579.80 excluding additional "quarterly true-up" pay to account for "actual shifts worked." AR 8. In her notes of the call, Ehlke described

---

[2] Dr. Turna asserts no claim in this case regarding the alleged underpayment of his short-term disability benefits.

[3] The Parties describe Gudgell as Chief Administrative Officer. Pl.'s Mem. in Supp. at 12 [ECF No. 27]; Def.'s Resp. Mem. at 6 [ECF No. 33]. Though Ehlke spelled Gudgell's name as "Gudgel" in her notes, and the Parties' briefing does the same, *see, e.g.*, Pl.'s Mem. at 12 and Def.'s Resp. Mem. at 6, source documents including the July 1, 2015 compensation notice, AR 8, spell the name "Gudgell."

Gudgell as being "very aware of Dr. Turna and his benefit base." AR 59. She described talking with Gudgell "about the discrepancy between our benefit base and Dr. Turna's annual salary calculation" and that Gudgell "let [her] know that Dr. Turna did in fact work many, many hours over his base and did earn upwards of $400,00 each year because of this." *Id.* Ehlke recorded that Gudgell "commended Dr. Turna for his work effort, but states his base pay was the $298,579.84" identified in the July 1, 2015 compensation notice. *Id.*

Ehlke approved Dr. Turna's claim for long-term disability benefits and notified Dr. Turna of her decision in a letter dated September 6, 2016. AR 417–19. Ehlke referred to the "Amount of Benefit" term of the Plan and concluded that Dr. Turna's "base annual salary" at the commencement of his disability in March 2016 was $298,579.84. AR 417. Ehlke addressed how the relatively small number of hours Dr. Turna continued to work would affect his benefits, described the process by which he would receive his benefits, asked him to apply for Social Security disability benefits, explained the effect that process might have on his Plan benefits, and concluded by describing the Plan's two-level administrative-appeal process. AR 417–19. Ehlke did not address specifically or respond directly to Dr. Turna's contention that Mayo had miscalculated his baseline annual salary in connection with his short-term disability benefits. *See id.*

## C

Roughly three weeks later, on September 28, Dr. Turna's counsel e-mailed Ehlke to express concern "that the figure [Ehlke] cite[d] as Dr. Turna's base annual salary, $298,579.84, is not accurate." AR 422. She continued: "Specifically, we have reason to

believe this figure represents considerably less than the 1.0+ FTE rate he consistently was scheduled to work prior to the time his disability began." *Id.* Dr. Turna's counsel asked Ehlke for "an explanation of why you believe Dr. Turna's base annual salary was $298,579.84" and closed by observing that "[p]erhaps there is a clear explanation, but based on his regularly scheduled hours, the shift expectations communicated to him by Chief Administrative Officer Bill Priest, and his multi-year pay history, neither we nor Dr. Turna can decipher it." *Id.*

Ehlke responded promptly the following day, September 29, writing in an e-mail that she had relied upon "salary information from a Mayo Clinic benefit database" and the "basic salary that [she] used was in place prior to Dr. Turna's disability commencement date and may not necessarily reflect actual earnings during the tax year." AR 421. Ehlke pointed out that the salary she used to determine the amount of Dr. Turna's disability benefits was "the basic salary specific to Dr. Turna prior to any bonuses, incentive pay, commissions, overtime pay, shift pay or other extra compensation." *Id.* Ehlke again quoted the "Amount of Benefit" term of the Plan and referred Dr. Turna's counsel to the Plan's administrative-appeal procedures. *Id.*

Dr. Turna's counsel replied to Ehlke's message the same day—about two hours later, in fact. AR 420. Dr. Turna's counsel asserted that multiplying Dr. Turna's "various rates of pay by the number of shifts he was regularly scheduled to work" produced a number "far in excess of $298,579.84, and in fact [that] was closer to $400,000." *Id.* She acknowledged "of course, that [Dr. Turna] received bonuses, incentives, etc. that caused his actual earnings to be even higher," and closed with a request:

We only wish to understand how this rate was calculated, so that we may understand why we are reaching such disparate conclusions on Dr. Turna's base annual salary. Could you please provide the computation that you made, and the variables associated with the computation (such as FTE assumptions, shifts or hours, or rates that went into the $298,579.84 figure). This information is critical in order for Dr. Turna to minimally understand the rationale for your determination.

*Id.*

Ehlke responded to Dr. Turna's counsel in a letter dated October 13, 2016. AR 53. Ehlke referenced the July 1, 2015 compensation notice as the source of Dr. Turna's "basic salary." *Id.* Ehlke also purported to quote the Plan's "Amount of Benefit" provision, just as she had in her September 6 letter to Dr. Turna, AR 417–19, and in her September 29 e-mail to his counsel, AR 421. This time, however, Ehlke quoted a revised and inapplicable "Amount of Benefit" term that defined "Annual Benefit Salary" as a participant's "basic salary, *as determined by your employer*, at the time your disability begins and the Elimination Period commences (based on your regularly scheduled hours) and does not include bonuses, incentive pay, commissions, overtime pay, shift pay or any other extra compensation." AR 53 (emphasis added). The term Ehlke quoted evidently came from a version of Mayo's long-term disability plan that had been revised or amended after Dr. Turna became disabled. *See* AR 1344. It differed from the prior version in two ways: it changed the term "Annual Salary" to "Annual Benefit Salary," and it included the italicized "as determined by your employer" clause. *Compare* AR 1344 *with* Compl. Ex. A at 12. The Parties confirmed at the hearing on these motions that this revised term does not apply

to Dr. Turna's claim. Regardless, Ehlke relied upon the term in her October 13 letter to

explain her decision. She wrote:

> "Annual Benefit Salary" does not include all compensation
> paid to Dr. Turna (or any other physician) annually. Rather, it
> includes only Dr. Turna's "basic salary," *as determined by
> Mayo Clinic*, at the time Dr. Turna's disability began and the
> Elimination Period commences.
>
> In July 2015, Mayo Clinic provided Dr. Turna with the
> enclosed memorandum stating that his basic salary for the year
> in question was $298,579.80. The figures of 133.5 and 10.5 in
> the memorandum represent the required annual number of
> weekday and weekend shifts required.

AR 53 (emphasis in original).

## D

Dr. Turna, through counsel, submitted a first-level appeal to Mayo on November 29,

2016, raising several arguments challenging the determination that Dr. Turna's "annual

salary" was $298,579.80. AR 265–71 (appeal letter). It helps to describe each of Dr.

Turna's arguments separately, though some of the arguments are not clear:

- Dr. Turna asserted that he was expected to work "a minimum of 2,080
  hours per year, with approximately 1/3 in the Emergency Department
  and 2/3 in the Hospital, and that his hourly rates should be calculated
  with that expectation in mind." AR 266. Dr. Turna did not identify
  what he thought appropriate "hourly rates" might be. *See generally*
  AR 265–71.

- Dr. Turna asserted that he "had little to no discretion in picking up
  extra shifts—rather, he was fully expected take [sic] his fair share of
  the numerous uncovered shifts to fill the needs of the facility." AR
  267. To support this assertion, Dr. Turna cited a printout showing his
  (and other providers') schedules for the fifteen months from January
  2015 through March 2016 and represented that the printout "was
  consistent with a 2,400 hour annual schedule." AR 267, 275–89.

- Dr. Turna recounted an error Mayo had made in 2015 that resulted in an underpayment of compensation to him, AR 267, but then cited an exhibit (an e-mail thread) showing that Mayo had corrected the error, AR 301–03.

- Dr. Turna described a change Mayo implemented to its Cannon Falls compensation model effective July 1, 2015, and asserted that the "change was in no way intended to result in a salary reduction from the $396,691 he was offered for 2015 in December 2014." AR 268. As support for this assertion, Dr. Turna cited a December 11, 2014 notice that his 2015 compensation would be $396,691. AR 304. The notice also included the following statement: "This rate will be in effect thru [sic] April 2015. Beginning in May 2015, compensation will be adjusted to account for Outcome, Safety, Patient satisfaction impacts." *Id*.

- Dr. Turna criticized the July 1, 2015 notice informing him that his compensation beginning that same day through April 2016 would be $298,579.80 on two grounds. AR 268. First, he asserted that the document's reference to a "quarterly true up to actual shifts worked" meant the document's drafters were "fully aware" that Dr. Turna would work more hours than expected. *Id*. (internal quotation marks omitted). Second, he pointed out that the document failed to account for any shifts in the Emergency Department though Mayo expected him to spend approximately one-third of his time working there. *Id*.

- Dr. Turna identified the hours he had worked from July 1, 2015 through March 2016, and asserted: "So only three quarters of the way into the year of the new salary model, he had already worked 333 more hours than 'expected' . . . and earned $154,628.26 more than 'expected'. Plainly, the July 1, 2015 document was a wholly unrealistic estimate that was never intended to actually reflect the amount of work that Dr. Turna would actually be asked to perform in that period." AR 268–69.

- Dr. Turna asserted essentially that all of his compensation for 2015, an amount he represented to be $492,770.52, should be considered "annual salary" as the Plan defined that term because no part of this compensation was "bonuses, incentive pay, commissions, overtime pay, shift pay or other extra compensation." AR 270.

Mayo issued a decision denying Dr. Turna's first-level administrative appeal on December 23, 2016. AR 204–05. The decision was made by Stacy Kohlnhofer, Executive Director in Mayo's Recovery and Claims Services area. *Id.* In her two-page decision, Kohlnhofer quoted the applicable "Amount of Benefit" term of the Plan, and wrote that, pursuant to that term, "Dr. Turna's annual compensation sheet dated July 1, 2015 would document his annual salary at the time of disability." AR 204. Kohlnhofer continued:

> Mayo Clinic determines annual salary based on the annual compensation sheet and uses that figure as the basis for benefits, such as the LTD benefit. Benefits are not based on extra compensation. Earnings received for shifts worked above a 1.0 FTE are considered extra compensation for the purposes of annual salary.
>
> The July 1, 2015 annual compensation sheet documents the minimum compensation in which [sic] Dr. Turna was to be paid. According to the annual compensation sheet, Dr. Turna is not guaranteed any salary above and beyond $298,579.80. Dr. Turna is a 1.0 FTE and his hourly rate of pay in March 2016 was $143.55. When $143.55 is multiplied by 2,080 hours (a 1.0 FTE equivalent), the sum is $298,584 (a $4.20 difference from the annual compensation sheet). Since the number of shifts above and beyond what is listed could not be ascertained, the quarterly true-up language is included to ensure Dr. Turna receives <u>extra compensation</u> for shift hours worked above the 1.0 FTE.

AR 205 (emphasis in original). Kohlnhofer concluded her decision by advising Dr. Turna of his right to a second-level administrative appeal and the procedures governing such an appeal. *Id.*

E

Dr. Turna, again through counsel, lodged a second-level appeal on January 13, 2017. AR 426–28. In this appeal, Dr. Turna continued to identify what he believed were errors

in the July 1, 2015 compensation notice. He pointed out that the notice omitted mention of required emergency-room shifts though these shifts consistently had occupied one-third of Dr. Turna's "work time and compensation." AR 426. He asserted that the notice accounted for only "1,665 work hours," an amount less than Dr. Turna believed was the minimum Mayo required of him and which Dr. Turna believed supported his contention that expected emergency-room shifts had been excluded from the calculation. AR 427. Dr. Turna also criticized Kohlnhofer's assertion that Dr. Turna's hourly rate of pay was $143.55. *Id.* Dr. Turna claimed never to have heard of the rate, characterized it as having been "concocted simply by dividing $298,579.80 by 2,080 hours," and pointed out that it was inconsistent with hourly rates derived from the July 1, 2015 compensation notice. *Id.*

A Plan Review Committee denied Dr. Turna's second-level appeal and explained its decision in a January 30, 2017 letter signed by committee chair David J. Schuitema. AR 192–95. Schuitema identified several reasons for the committee's decision. He asserted that information regarding Dr. Turna's salary and work history "prior to July 1, 2015 is not germane to this particular claim." AR 192. He pointed out that Dr. Turna had not objected to the July 1, 2015 notice setting his salary at $298,579.80, despite the availability of a "formal appeal" option. AR 192–93; *see also* AR 8. Schuitema also cited to an attached document identifying 1,728 hours as the number of shift hours a "Full-time FTE" hospitalist in a critical access hospital was expected to work. AR 193, 195. Of note, the document actually identified 2,080 as the total hours expected of a "Full-time FTE" but arrived at 1,728 shift hours by subtracting three categories from the 2,080-hour figure: 224 vacation hours; 80 CME (or continuing medical education) hours; and 48 holiday hours.

AR 195. Schuitema acknowledged that the $143.55 hourly rate first identified in Kohlnhofer's first-level appeal decision was "simply a mechanism used by the Mayo Clinic administrative system to pay Dr. Turna's base salary in 26 installments over a year," and asserted that, "[r]egardless of the administrative mechanism, Dr. Turna's base salary at the time of his disability was $298,579.80." AR 193. Schuitema also observed that Dr. Turna had the opportunity "at his discretion" to work extra shifts and supplement his base salary and that "extra shifts were reconciled and compensated in the form of a quarterly true-up that reflected the difference between the base salary for the period and the actual shifts worked." *Id.* The letter concluded by quoting the incorrect "Amount of Benefit" term from the Plan first cited by Ehlke in her letter of October 13, 2016 (containing the new "Annual Benefit Salary" term and the "as determined by your employer" clause) and advising Dr. Turna of certain rights under ERISA. AR 193–94.

Dr. Turna commenced this lawsuit just over one year later on February 26, 2018. *See* Compl. at 12. In his complaint, Dr. Turna asserts a single claim under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), seeking recovery of underpaid benefits pursuant to ERISA's civil enforcement provision, § 1132(a)(1)(B), attorneys' fees pursuant to § 1132(g), and pre- and post-judgment interest. Compl. ¶¶ 49–60, A–G.

II

A

Suits brought under § 1132(a)(1)(B) to recover benefits allegedly due to a participant are reviewed de novo unless the benefit plan gives the administrator

discretionary authority to determine eligibility for benefits. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan grants the administrator such discretion, then "review of the administrator's decision is for an abuse of discretion." *Johnston v. Prudential Ins. Co. of Am.*, 916 F.3d 712, 714 (8th Cir. 2019) (quoting *McClelland v. Life Ins. Co. of N. Am.*, 679 F.3d 755, 759 (8th Cir. 2012)). Here, there is no question the Plan vests Mayo with discretion to determine questions of benefit eligibility. Compl. Ex. A at 31 ("The Claims Administrator has the discretion, authority and responsibility to make final decisions on all factual and legal questions under the Plan, to interpret and construe the Plan and any ambiguous or unclear terms and to determine whether a participant is eligible for benefits and the amount of benefits."). Ordinarily, the presence of this discretion-granting language is enough to warrant abuse-of-discretion review.

Dr. Turna says two things in his briefing that raise uncertainty regarding his position with respect to the standard of review. First, Dr. Turna concedes only that the Plan's discretion-granting provision requires the "use [of] *some variant* of the abuse of discretion standard to review Mayo's determination." Pl.'s Mem. in Supp. at 17 (emphasis added) [ECF No. 27]. But Dr. Turna doesn't say what he means by "some variant." He defines no variant in his briefing. He cites no authority to support this assertion. And he seems to apply traditional abuse-of-discretion review to challenge the administrator's determination of his benefit amount. Dr. Turna provides no basis to apply "some variant" of abuse-of-discretion review here.

Second, Dr. Turna argues that Mayo's "confusion over applicable plan language indicates a haphazard review, and could justify de novo review." *Id.* at 20 (capitalization

omitted).  To support this assertion, Dr. Turna cites two unpublished cases from outside the Eighth Circuit: *Johnson v. Georgia-Pacific Corp.* 260 F. App'x 994, 996 (9th Cir. 2007), and *Huss v. IBM Med. and Dental Plan*, 418 F. App'x 498, 504 (7th Cir. 2011). Even if they were binding precedent, these cases would not support de novo review here. In *Johnson*, the Ninth Circuit reviewed an ERISA administrator's decision de novo because:

> [T]he administrator failed to exercise its discretion in rendering its final decision.  The administrator did not review any plan documents to determine whether Johnson's claim had been denied properly under the plan.  Instead it relied solely on a prior denial letter to deny Johnson's appeal, a denial letter that cited the wrong version of the plan in denying Johnson's claim. Indeed, there were no plan documents at all in the administrative record and the district court had to go outside the administrative record to determine the substance of the applicable plan language.  Because it did not construe plan terms or make its eligibility determination under the plan, the administrator did not exercise the discretion vested in it by the plan and the proper standard of review is de novo.

260 F. App'x at 996 (internal citations omitted).  The administrator's actions that prompted the court to apply de novo review in *Johnson* went beyond merely applying the wrong version of the plan.  And here, unlike the administrator in *Johnson*, Mayo did not "rel[y] solely on a prior denial letter" to reach its decision.  *See id*.  It reviewed plan documents. It reviewed and considered Dr. Turna's application and his two administrative appeals, and its review resulted in the creation of an administrative record.  In *Huss*, the Seventh Circuit did not apply de novo review—it applied the arbitrary-and-capricious standard of review to conclude that a benefits determination was unreasonable because it was based on an incorrect plan document that included a "condition that did not exist" in the applicable

plan. 418 F. App'x at 501, 505. *Huss* may support an argument that Mayo abused its discretion by considering an inapplicable plan document, but the case does not support the application of de novo review. Mayo's determination of Dr. Turna's benefits will be reviewed for an abuse of discretion.

B

The Eighth Circuit applies two distinct tests to determine whether an ERISA plan administrator's benefits determination was reasonable and not an abuse of discretion. First, to determine whether an administrator's interpretation of plan terms was reasonable, the court applies the five-factor test from *Finley v. Special Agents Mutual Benefit Association*, 957 F.2d 617, 621 (8th Cir. 1992). *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) (en banc); *see also id.* at 1014 (Gruender, J., dissenting). The five factors to be considered ask whether the administrator's interpretation: (1) is consistent with the goals of the plan; (2) renders any language of the plan meaningless or internally inconsistent; (3) conflicts with ERISA; (4) is consistent with the administrator's prior determinations regarding the terms at issue; and (5) is contrary to the clear language of the plan. *Peterson v. UnitedHealth Group Inc.*, 913 F.3d 769, 775–76 (8th Cir. 2019). "While these non-exhaustive factors 'inform our analysis,' the ultimate question remains whether the plan interpretation is reasonable." *Id.* at 776 (quoting *King*, 414 F.3d at 999). Second, to determine whether an administrator reasonably applied its interpretation to the facts of any particular case, the test is whether the decision is "supported by substantial evidence." *Johnston*, 916 F.3d at 714 (quoting *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1050 (8th Cir. 2011)). "Substantial evidence is more than a scintilla but less than a preponderance."

*Johnston*, 916 F.3d at 714 (quoting *Green*, 646 F.3d at 1050); *see also Jones v. Aetna Life Ins. Co.*, 856 F.3d 541, 547–48 (8th Cir. 2017) (citations omitted) (same).

Other considerations are relevant to both tests. "If an administrator also funds the benefits it administers . . . the district court 'should consider that conflict as a factor' in determining whether the administrator abused its discretion." *Jones*, 856 F.3d at 548 (quoting *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 718 (8th Cir. 2014)). "A decision supported by a reasonable explanation . . . should not be disturbed, even though a different reasonable interpretation could have been made." *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 832–33 (8th Cir. 2014) (alteration in original) (citation and internal quotation marks omitted), *as corrected* (July 15, 2014); *see also Prezioso v. Prudential Ins. Co. of Am.*, 748 F.3d 797, 805 (8th Cir. 2014) ("We must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." (citation and internal quotation marks omitted)). "[A] reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales." *Waldoch*, 757 F.3d at 829–30 (citation and internal quotation marks omitted). "Courts reviewing a plan administrator's decision to deny benefits will review only the final claims decision, and not the 'initial, often succinct denial letters,' in order to ensure the development of a complete record." *Khoury v. Group Health Plan, Inc.*, 615 F.3d 946, 952 (8th Cir. 2010) (citing *Galman v. Prudential Ins. Co. of Am.*, 254 F.3d 768, 770–71 (8th Cir. 2001); *Wert v. Liberty Life Assurance Co. of Boston*, 447 F.3d 1060, 1066 (8th Cir. 2006)).

Mayo's interpretation of the "Amount of Benefit" term was not explicit, and that injects uncertainty into the task of applying the Eighth Circuit's *Finley* factors. Though the term requires a benefit amount to be calculated by reference to a participant's "basic salary," Compl. Ex. A at 12, Mayo never specifically defined this term in its adjudication of Dr. Turna's claim. Similarly, though the "Amount of Benefit" term says that the amount of a participant's "basic salary" is based on "regularly scheduled hours," *id.*, Mayo did not explicitly describe the meaning of "regularly scheduled hours." The same is true for the categories of pay excluded from the computation of "annual salary" ("bonuses, incentive pay, commissions, overtime pay, shift pay or other extra compensation"). *Id.* Mayo did not explicitly define any of these terms.

Mayo's adjudication of Dr. Turna's claim nonetheless implicitly reflects interpretation of the Plan's "Amount of Benefit" term, and that is how the Parties appear to understand and present the issue. In their briefs, the Parties seem to agree that Mayo implicitly interpreted "regularly scheduled hours" to mean the minimum number of hours Dr. Turna was required to work as a condition of his Mayo employment. *See* Def.'s Mem. in Supp. at 12–13 [ECF No. 18]; Pl.'s Mem. in Supp. at 22–23; Def.'s Resp. Mem. at 15 [ECF No. 33]. The Parties also seem to agree that Mayo implicitly interpreted "basic salary" to mean the compensation Dr. Turna was to receive in consideration for working that minimum number of hours. *See* Def.'s Mem. in Supp. at 12; Pl.'s Mem. in Supp. at 25–26. Mayo's first- and second-level appeal decisions fairly reflect the Parties' understanding of Mayo's interpretation. The first-level appeal decision says that "shifts

worked above a 1.0 FTE" do not contribute to the determination of basic salary and that only the salary "guaranteed" for these shifts is considered. AR 205. The second-level appeal decision similarly identifies the hours required of a "full time equivalent for a hospitalist position" and a base salary for these hours. AR 193. Neither decision specifically or consistently categorizes compensation for work done beyond "regularly scheduled hours." The first-level decision says this is all "extra compensation." AR 205. The second-level decision says this compensation is the result of "extra shifts." AR 193.

As for the first *Finley* factor, Dr. Turna argues that Mayo's interpretations are not consistent with the goals of the Plan. He points out that the Plan is intended to "provide long term *income replacement* benefits in the event [a claimant is] disabled from illness or injury," and asserts that Mayo's interpretation would conflict with this goal because it would "result[ ] in the failure to *replace* a large portion of Dr. Turna's *income*." Pl.'s Mem. in Supp. at 23 (emphasis in original) (citing Compl. Ex. A at 8). True enough. But the Plan just as clearly is intended not to replace significant portions of any given participant's income. The "Annual Salary" term makes this clear. It says that a participant's monthly benefit "is based on 84% of . . . annual salary," and it excludes several categories of compensation that for many employees might provide substantial income. Compl. Ex. A at 12. The Plan's more general statement that it is intended to provide "income replacement benefits" must be understood in light of the more specific "Annual Salary" term. Even if that were not so, saying that the Plan's purpose is "to replace a large portion of . . . income," Pl.'s Mem. in Supp. at 23 (emphasis omitted), says nothing materially informative about the amount of benefits any participant should receive.

Dr. Turna argues that Mayo's interpretations render language in the Plan meaningless or internally inconsistent in violation of the second *Finley* factor. He asserts that Mayo did not include in its calculation of his "regularly scheduled hours" shifts Dr. Turna was required to work in the Emergency Department. Pl.'s Mem. in Supp. at 24. This concern seems directed not at Mayo's interpretation of the term "regularly scheduled hours," *see* Compl. Ex. A at 12, but at Mayo's application of the term as interpreted to the facts of Dr. Turna's claim, and it will be addressed that way in part II.B.2, below.

This concern aside, one aspect of Mayo's interpretation deserves comment in relation to the second *Finley* factor. It would seem to render Plan language meaningless to interpret the "Amount of Benefit" term to mean simply that compensation for any work beyond "regularly scheduled hours" does not count toward determining a physician's "annual salary." *See id*. If that were correct, there would be no need for the "Amount of Benefit" term to identify excluded categories. In other words, to be excluded from the determination of a physician's "basic salary," the "Amount of Benefit" term requires compensation to be (1) for work beyond a physician's "regularly scheduled hours," and (2) within one of the excluded categories. *See id.* Determining a physician's annual salary solely by reference to the first step would render the second step (and the excluded categories) unnecessary and the excluded categories meaningless—classic surplusage the Eighth Circuit says should be avoided. *See e.g.*, *Harris v. Epoch Group, L.C.*, 357 F.3d 822, 825 (8th Cir. 2004). Consistent with this interpretation, Mayo's adjudication of Dr. Turna's claim all but skipped the second step. Mayo defined none of the excluded categories, and though the meaning of "bonuses, incentive pay, commissions, overtime

pay, shift pay or other extra compensation" may be obvious in many contexts, that is not so here. *See* Compl. Ex. A at 12. How, for example, does Mayo define the term "shift pay"? How is "shift pay" different from "overtime pay"? If the term "other extra compensation" is intended to serve as a catch-all for excluded compensation that does not fit within any of the other categories, what types of compensation does it include? Particularly in view of the Eighth Circuit's admonition that ERISA plan terms should be interpreted to avoid surplusage, defining and differentiating these terms—or at least the terms Mayo says apply to Dr. Turna's claim—seems important.

Regarding the third *Finley* factor, Dr. Turna argues that Mayo's interpretation conflicts with ERISA because it is "misleading" and, if accepted, would transform the Plan document into one that is not "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights and obligations under the plan" as required by 29 U.S.C. § 1022(a). Pl.'s Mem. in Supp. at 24–25. Dr. Turna identifies no deficiencies with the summary plan description as written. For all practical purposes, this argument seems to be another way of saying that Mayo's interpretation of the "Amount of Benefit" term of the Plan is unreasonable in light of the text of that provision. The argument does not implicate a violation of, or a conflict with, any particular requirement in ERISA.

Dr. Turna next argues that Mayo's interpretation was not consistently applied throughout his claim. He does not argue that Mayo has applied its interpretation inconsistently as between his claim and the claims of others. In support of this contention, Dr. Turna identifies what he characterizes as "various sparse explanations for why [his]

'annual salary' should be limited to $298,579.80." Pl.'s Mem. in Supp. at 25. Specifically,

he argues:

> At first, Nancy Ehlke doesn't attempt to explain her interpretation at all, relying entirely on the mere existence of the July 2015 document. Then, in Stacy Kohlnhofer's first level denial, the Claims Administrator asserts that "extra compensation" is anything over a 1.0 FTE. Next, David Schuitema abandons discussion of FTE and instead claims that "extra compensation" is any compensation that is paid for discretionary shifts. And now, in its motion for summary judgment, Mayo exhumes the FTE argument (arguing that only the hours "required" by his 1.0 FTE were benefit eligible), and impermissibly adds the argument that other hours were "overtime pay" and "shift pay", as well as "extra compensation."

Pl.'s Mem. in Supp. at 25–26 (internal citations omitted).

Dr. Turna's argument that Mayo's reliance on the "FTE argument" shifted between

appeals is not correct. Kohlnhofer relied explicitly on that consideration in her adjudication

of the first-level appeal, AR 205, and Schuitema references the "full time equivalent for a

hospitalist position" in his decision on the second-level appeal, AR 193. Dr. Turna is

correct, however, that Mayo's decisions were not consistent in their classification of his

compensation in excess of basic salary. Kohlnhofer characterized it as "extra

compensation," the catch-all excluded category. AR 205 ("Earnings received for shifts

worked about a 1.0 FTE are considered extra compensation for the purposes of annual

salary."). Schuitema classified this compensation as the result of "extra shifts," a term not

in the "Amount of Benefit" provision. AR 193; *see* Compl. Ex. A at 12. In view of the

Eighth Circuit's general rule that a reviewing court should consider "only the final claims

decision," *Khoury*, 615 F.3d at 952 (citing *Galman*, 254 F.3d at 770–71; *Wert*, 447 F.3d at

1066), this inconsistency may be irrelevant.[4]  Regardless, the lack of clearer or consistent treatment of this issue appears to be the consequence of the fact that Mayo's interpretation of the Plan renders the excluded categories meaningless.

Dr. Turna also is correct that Mayo's briefing of this aspect of its administrative decisions is not accurate, though this seems more like a violation of the rule against *post hoc* rationales than a violation of the fourth *Finley* factor.  Mayo asserts in its opening brief that it "reasonably concluded that hours Plaintiff worked over and above the basic salary communicated to him in July 2015 were overtime pay, shift pay, or extra compensation, and are therefore excluded when calculating his LTD benefit." Def.'s Mem. in Supp. at 11. This is not correct.  None of Mayo's administrative decisions characterized any of Dr. Turna's compensation as "overtime pay."  Though Schuitema wrote in his determination of the second-level appeal that Dr. Turna worked "extra shifts," AR 193, he did not specifically characterize any of Dr. Turna's compensation as "shift pay."  It is true that Kohlnhofer classified Dr. Turna's compensation beyond basic salary as "extra compensation," AR 205, but Schuitema did not make that same classification in his second-level appeal decision.

---

[4]     It is not obvious that these contentions implicate a violation of the fourth *Finley* factor for an additional reason.  By its very nature, a multi-level ERISA administrative process is designed to allow an administrator to revise or hone the explanation for its benefits determination—or even reverse its determination outright—in response to a claimant's appeals.  *See Galman*, 254 F.3d at 770–71.  It makes sense, then, that this factor would focus on an administrator's previous interpretations of disputed plan terms in other claims, not the same claim.

Dr. Turna says that Mayo's interpretation of the "Amount of Benefit" term conflicts with the Plan's clear language, but his arguments do not address Mayo's interpretation of the term so much as the evidence Mayo relied on to reach a final decision. He faults Mayo for "treat[ing] the July 2015 salary document as irrefutable evidence of 'regularly scheduled hours.'" Pl.'s Mem. in Supp. at 27. Dr. Turna says that document is not accurate. He argues that Mayo's determination failed to account for hours he was "regularly scheduled" to work in the Emergency Department. *Id.* at 28 (emphasis omitted). He also asserts that Mayo "misconstrues [his] statement that he occasionally received offers for bonus pay for working last-minute shifts as an admission that a meaningful portion of his work was 'extra compensation.'" *Id.* Assertions that a document is unreliable, that hours were not accounted for, and that a statement was misconstrued may be relevant to whether substantial evidence supports Mayo's decision, but these assertions do not bear on or undermine the reasonableness of Mayo's interpretation of the "Amount of Benefit" term of the Plan.

In addition to the five "non-exhaustive" *Finley* factors, *Peterson*, 913 F.3d at 776, one additional aspect of Mayo's interpretation warrants consideration. Twice during the administrative process, Mayo relied on a different, inapplicable version of the "Amount of Benefit" provision. As described earlier, the version quoted and relied on in Ehlke's October 13, 2016 letter to Dr. Turna's counsel and Schuitema's final, second-level appeal letter differs from the applicable provision in two ways. *See* AR 53, 193. First, it uses the term "Annual Benefit Salary" in place of "annual salary." *Compare* AR 53, 193 *with* Compl. Ex. A at 12. Second, it adds a clause saying that a participant's "basic salary" is

"as determined by your employer." *Id.* These differences are not without significance. In comparison to "annual salary," the term "Annual Benefit Salary" seems intended to emphasize—and perhaps is more likely to alert a participant to—the fact that a benefit amount is not determined merely by reference to the participant's total compensation but by reference to some portion of the participant's compensation that counts toward benefits. At least it seems that would have been the point of inserting the word "benefit" into the "annual salary" term. That the term is capitalized and appears in bold text invites attention to these points. Adding the "as determined by your employer" clause seems intended to make explicit that Mayo has exclusive authority under the Plan to determine a participant's basic salary.

An ERISA plan administrator's reliance on an inapplicable plan document or term may warrant finding that the administrator abused its discretion. *See, e.g.*, *Huss*, 418 F. App'x at 504. But that conclusion seems dubious if, for example, there are no material differences between the inapplicable and applicable plan documents or application of the inapplicable document had no identifiable bearing on the administrator's decision. Here, what impact Mayo's mistaken reliance on the revised, inapplicable "Amount of Benefit" term had on its adjudication of Dr. Turna's claim is not clear. There are reasons to think it might have made no or little difference. Though he cited the incorrect version, Schuitema did not emphasize or rely specifically on either of the two revisions in his final denial letter. *See* AR 193. The basic reasons Schuitema gave for his decision also appeared in Kohlnhofer's first-level appeal decision, and Kohlnhofer cited the correct version of the "Amount of Benefit" term. *See* AR 204. The inapplicable revisions seem at least

consistent with Mayo's interpretation of the applicable "Amount of Benefit" term. At the same time, Mayo's litigation position suggests how the revised-but-inapplicable term might have affected its final decision. Though Mayo argues in its response brief that "[t]here is, in fact, no meaningful difference between the two different versions of the Plan," Def.'s Resp. Mem. at 12, it relied in its opening brief on the inapplicable version and emphasized the "as determined by your employer" revision:

> *First*, the evidence in the record demonstrates that Mayo reasonably interpreted both the Plan's language and the facts of this case. The Plan's language clearly states that Plaintiff's LTD benefit would be determined based upon his "basic salary . . . *as determined by [his] employer*." Plan at 12 (emphasis added). There is no reasonable dispute that the July 2015 salary document provided to the Plaintiff was exactly that—a recitation of his "basic salary" that was "determined by" Plaintiff's employer—Mayo Clinic. Because this was a reasonable interpretation of the Plan and the facts of this case, no further inquiry is needed to resolve this matter.

Def.'s Mem. in Supp. at 11 (alterations in original) (citations omitted). In other words, (1) the amount of benefits is determined by "basic salary"; (2) basic salary is determined by Mayo; (3) Mayo determined Dr. Turna's basic salary to be $298,579.80, and "no further inquiry is needed to resolve this matter." *See id.* With respect to interpretation of the Plan, accepting this approach would render consideration of the excluded categories unnecessary. That, in turn, would render those terms meaningless. Consistent with this approach, Schuitema did not address the excluded categories in his final decision.

To summarize, Mayo's interpretation of the Plan's "Amount of Benefit" term was not reasonable. Mayo's final decision (Schuitema's second-level appeal letter) relied upon

an inapplicable version of the Plan. AR 193. And regardless of version, Mayo's interpretation of the term rendered Plan language—the excluded categories—meaningless.

2

The evidence Mayo cited in the administrative process to determine Dr. Turna's "regularly scheduled hours" and "basic salary" is not extensive. In his final denial letter, Schuitema cited two documents. He cited the July 1, 2015 compensation notice, AR 8, to establish that "Dr. Turna's base salary was set at $298,579.80." AR 192. And he cited and attached as an exhibit an untitled document, AR 195, "to further clarify and define the calculation of that base salary." AR 193. Schuitema wrote that this second "document explains the full time equivalent for a hospitalist position is 1728 hours." *Id.*[5]

The two documents cited are not by themselves or considered together substantial evidence sufficient to support Mayo's determination that Dr. Turna's "annual salary" for purposes of determining the amount of his long-term disability benefits was $298,579.80. It is certainly true that the July 1, 2015 compensation notice identifies this figure as Dr. Turna's "compensation beginning 7/01/15" and says that "[t]his rate will be in effect thru [sic] April 2016." AR 8. But the document nowhere describes this figure as Dr. Turna's "basic salary"—the relevant term in the Plan—or otherwise connects the compensation amounts it identifies to the Plan. *See id.*; Compl. Ex. A at 12. The document refers to a

---

[5] Mayo's previous decisions did not cite additional or different evidence. In her first-level appeal letter, Kohlnhofer cited only the July 1, 2015 compensation notice. AR 204–05. Ehlke's initial decision seems to have cited no evidence, though she included the $298,579.84 figure and described it as Dr. Turna's "annual salary at the time [his] disability beg[an]." AR 417.

"process" by which Dr. Turna's compensation was determined, but the process is not described, much less in a way that would permit relying on that process and its results to ascertain Dr. Turna's "annual salary" for purposes of the Plan. AR 8. Though the document says that "compensation is based on the expected number of shifts worked in the emergency or hospitalist departments," it lists compensation amounts for "Hospitalist Day Shift" and "Hospitalist Weekend" only and omits a compensation amount for "emergency" shifts. *Id.* The July 1, 2015 notice also says that a "quarterly true-up to actual shifts worked will be made until the desired staffing level for the model is achieved," suggesting that Dr. Turna was expected to receive additional compensation for "actual shifts worked." *Id.* The document itself says nothing about whether this additional compensation, or some part of it, would or would not count toward determining Dr. Turna's annual salary for purposes of the Plan.

The second document, both cited in and attached as an exhibit to Schuitema's final denial letter, contains the heading "**Critical Access Hospital – Primary Care Staffing/Compensation Model**" and identifies 1,728 hours as equivalent to a "Full-time FTE." AR 195. The document reflects that the 1,728-hour figure was determined by identifying 2,080 hours as the full-time benchmark, and then reducing that number by 224 hours for vacation, 80 hours for continuing medical education, and 48 hours for holidays. *Id.* These numbers are consistent with Mayo's position regarding the minimum number of hours it expected Dr. Turna to provide services. *See, e.g.*, Def.'s Mem. in Supp. at 1. Regardless, the document is not substantial evidence justifying Mayo's benefits determination. The document identifies no author, no title, no date, and no purpose for its

creation.  *See* AR 195.  Much of the data and information in the document—and its relevance to Dr. Turna's claim—seems out of reach without additional competent explanation.  Mayo identifies no additional evidence in the administrative record that provides additional support or explanation for its final decision.[6]

3

A remand to the administrator is appropriate when "an ERISA-regulated plan denies a claim for benefits based on an unreasonable interpretation of terms in the plan," *King*, 414 F.3d at 1005, and where it remains unclear whether a claimant was denied benefits to which he was entitled, *see Helfman v. GE Group Life Assurance Co.*, 573 F.3d 383, 396 (6th Cir. 2009); *Greenwald v. Liberty Life Assurance Co. of Boston*, 932 F. Supp. 2d 1018, 1048 (D. Neb. 2013).  Both conditions are present here.[7]

---

[6]    Mayo says this case is just like *Khoury v. Group Health Plan, Inc.*, 615 F.3d 946 (8th Cir. 2010).  In *Khoury*, as here, a physician challenged an ERISA plan administrator's determination of the amount of long-term disability benefits arguing the amount was unreasonably low.  *Id.* at 949.  But there are dispositive distinctions between this case and *Khoury*.  The relevant plan term at issue in *Khoury* was distinct.  *Id.* at 950.  The administrator adopted a reasonably explicit "dictionary definition" of a key plan term, "overtime," and the administrator possessed sufficient evidence to identify compensation attributable to "overtime."  *Id.* at 950–51, 955.  These facts are not present here.

[7]    In his opening brief, Dr. Turna acknowledges that "[t]here is no single alternative sum that obviously represents his 'annual salary' based on 'regularly scheduled hours,'" and that through the course of the administrative proceedings and this case "[he] has proposed more than one reasonable alternative."  Pl.'s Mem. in Supp. at 37–38.  He then suggests, rather than a remand, that he be awarded benefits based on an "annual salary" of $407,424.  *Id.* at 37–39.  The explanation offered for this number is not clear, relies at times upon evidence of uncertain relevance, relies at other times upon no authority, and helps to show why remand is the appropriate resolution of the Parties' motions.

# ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED THAT**:

1. Plaintiff's motion for summary judgment [ECF No. 25] is **DENIED**.

2. Defendant's motion for summary judgment or alternatively, to remand [ECF No. 23] is **DENIED IN PART** and **GRANTED IN PART**. The motion is denied to the extent Defendant seeks summary judgment. The motion is granted to the extent Defendant seeks remand.

3. This matter is **REMANDED** to Defendant for administrative proceedings to determine consistent with this Opinion and Order of the amount of Plaintiff's benefit. The Court retains jurisdiction over this matter.


Dated: April 16, 2019                 s/ Eric C. Tostrud
                                       Eric C. Tostrud
                                       United States District Court